<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| MONICA MCQUEEN, individually and on behalf of all others similarly situated, | : : : : | Civil Action No. 12-06674 (SRC) |
| Plaintiff, v. | : : : : : | OPINION |
| BMW OF NORTH AMERICA, LLC, and BAYERISCHE MOTORENWERKE AKTIENGESELLSCHAFT, | : : : : : | |
| Defendants. | : : | |

<u>**CHESLER**</u>, District Judge

This matter comes before the Court on the motion to dismiss the Second Amended Class Action Complaint ("SAC"), filed by Defendant BMW of North America, LLC ("Defendant" or "BMW") pursuant to Federal Rule of Civil Procedure 12(b)(6). [Docket Entry 45.] Plaintiff Monica McQueen ("Plaintiff" or "McQueen") opposes the motion. [Docket Entry 48.] The Court has considered the parties' submissions, and will rule on the motion without oral argument, pursuant to Federal Rule of Civil Procedure 78. For the foregoing reasons, the Court will grant Defendant's motion, and the SAC will be dismissed with prejudice.[1]

**I.      Background**

The SAC is Plaintiff's latest attempt to plead a cognizable cause action based upon an alleged defect in BMW "7-series" sedans sold between 2002 and 2008. Plaintiff is the owner of

---

[1] Because the Court finds that the SAC should be dismissed for failure to state a claim, it need not reach BMW's alternative argument that Plaintiff's class-action allegations should be dismissed. (<u>See</u> Mov. Br. at 16.)

a 7-series that she bought used in 2008. In a previous Order, the Court granted a Rule 12(b)(6) motion filed by BMW, dismissing the First Amended Class Action Complaint ("FAC") without prejudice. [Docket Entry 39.] The Opinion accompanying that Order found that Plaintiff's New Jersey Consumer Fraud Act ("CFA") claim was pleaded with insufficient facts to satisfy the Supreme Court's heightened plausibility pleading standard and the strictures of pleading fraud under Rule 9(b). (See Aug. 29, 2013 Op., at 11-12.) In addition, the Court explained that Plaintiff's warranty claims were not actionable because the FAC did not contain allegations that Plaintiff attempted to have her 7-series vehicle repaired at a BMW service center before the car's warranty expired. (See id. at 13.) The Court, however, gave Plaintiff the opportunity to rectify those pleading deficiencies with a new Complaint.[2]

To that end, the SAC still alleges that even though the National Highway Traffic Safety Administration ("NHTSA") only recalled "CAS"[3] equipped 7-series sedans, every 7-series from the 2002 to 2008 model years – including those which, like Plaintiff's, do not feature a CAS system – contains a defective transmission.[4] The SAC, however, goes into a substantially lengthier and more detailed discussion about the alleged transmission defect in Plaintiff's non-CAS 7-series sedan. Broadly speaking, Plaintiff now alleges the rollaway that damaged her 7-

---

[2] The FAC contained claims of negligence, negligent misrepresentation, and common law fraud, which the Court also dismissed without prejudice. (See Aug. 29, 2013 Opinion, at 16.) The SAC abandons those claims.

[3] As described in more detail in the Court's previous opinion, Comfort Access System ("CAS") enabled 7-series series sedans can be started without putting the key in the ignition. The ability to start the vehicle without a key was central to the NHTSA's recall of CAS-equipped vehicles – the NHSTA found no evidence that an unexpected rollaway would occur in non-CAS vehicles, because such cars could only be started with a key in the ignition and would automatically shift to Park when the key was removed. (See Dalton Decl., Exs. E & D.)

[4] Because the Court writes solely for the parties, this Opinion does not revisit the factual allegations that remain unchanged from the FAC to the SAC and were discussed at some length in the August 29, 2013 Opinion. Rather, the Court is concerned primarily with the new pleadings contained in the SAC, which Plaintiff believes nudge her claims across the "plausibility" threshold.

series was the result of two separate defects that, when operating together, cause the transmission to shift unexpectedly into Neutral.  The SAC labels these two defects the "Logic Defect" and the "Random Event Defect."  The SAC equates the "Logic Defect" to an erroneous engineering decision made by BMW when designing the car – specifically, the 7-series' transmission automatically shifts to Neutral (and not Park) when "things go wrong."  (See SAC ¶¶ 13, 77-78.)  The SAC further alleges that BMW was aware of this "Logic Defect" "from the design stage [of the vehicle]" because BMW intentionally design the 7-series to operate in this manner.  (Id. at ¶ 80.)

The "Random Event Defect" (see SAC ¶ 13), is more esoteric.  According to Plaintiff, complex automotive systems like those found in the "Drive-by-Wire" transmission in Plaintiff's car can be expected to experience what might appear to be "random" "triggers or events."  (See Opp. Br. at 2 (quoting SAC ¶¶ 12, 88-90, 93).)  The SAC alleges that unlike "electronic component failures" that can be readily diagnosed, certain "electronic and software defects . . . may appear to occur at random" and thus by nature can elude verification.  (SAC ¶¶ 86-87.)  Indeed, the SAC alleges that the "rollaway incidents" in non-CAS vehicles investigated by the NHSTA were considered "random events" by the Administration.  (Id. at ¶ 85.)  The SAC appears to allege that BMW's failure to account for "the possibility of random, non-repeatable failures . . . in electronics and software components" renders Plaintiff's non-CAS 7-series defective.  (See id. at ¶¶ 93, 97.)  The SAC alleges "[u]pon information and belief" that BMW "knew about the Random Event Defect" and that "an event of this type was foreseeable by BMW at the time it was designing the vehicles."  (Id. at ¶ 110.)

To summarize, and because the SAC instructs that the two defects are "interrelated," the

Court understands the overarching problem with Plaintiff's vehicle to be the following: BMW engineered the 7-series to decide to shift to Neutral instead of Park when faced with random and unexplained failures that BMW nevertheless should have expected would occur in the highly complex automotive system that is the 7-series' transmission.  Or, in short, Plaintiff alleges that "things go wrong" randomly in more complex automobiles, and it is a defect in design for a car's transmission to default to Neutral when such an event occurs.

The rest of the SAC remains substantively unchanged from Plaintiff's earlier pleading.  The vehicle at issue was initially sold in 2004 with a four year/50,000 mile warranty[5]; Plaintiff, purchased the car used in 2008 and she does not allege that she witnessed the defect or reported it to BMW before the time and mileage limitation expired.  Rather, Plaintiff alleges the defect has caused her car to unexpectedly roll away at least five times, and that "[r]ecently," her car unexpectedly "shifted into Neutral" and rolled into her garage door, damaging both the car and the door.

The SAC reasserts three causes of action based on the defect.  The first alleges that BMW violated New Jersey's Consumer Fraud Act, N.J. Stat. Ann. 56:8-1 to -20, by failing to "disclose the defects inherent in the electronically controlled transmission system" contained in Plaintiff's non-CAS 7-series vehicle.  (SAC ¶ 157).  As a result of this behavior, Plaintiff alleges that she and other putative class members have suffered losses including "increased repair costs" and the difference in value between what consumers thought they were paying for (non-defective vehicles) and what they actually received (vehicles with defective transmissions).  (See id. at ¶ 159.)   Plaintiff's second claim alleges BMW breached the Magnuson-Moss Warranty Act

---

[5] Plaintiff's limited warranty coverage states: "To obtain service under this warranty, the vehicle must be brought, upon discovery of a defect in material or workmanship, to the workshop of any authorized BMW center, during normal business hours." (Dalton Decl., Ex. H, at 30.)

("MMWA"), 15 U.S.C. §§ 2301-2312, the federal law that establishes certain minimum standards for retailers who provide written warranties to consumers. (SAC ¶ 173.) Plaintiff's third claim alleges a breach of the Uniform Commercial Code's implied warranty of merchantability, N.J. Stat. Ann. § 12A:2-314. (SAC ¶¶ 180-81.)

**II.     Discussion**

    **A.     Legal Standards**

A complaint will survive a motion under Rule 12(b)(6) only if it states "sufficient factual allegations, accepted as true, to 'state a claim for relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic v. Twombly, 550 U.S. 554, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). Following Iqbal and Twombly, the Third Circuit has held that, to prevent dismissal of a claim, the complaint must show, through the facts alleged, that the plaintiff is entitled to relief. Fowler v. UPMC Shadyside, 578 F.3d 203, 211 (3d Cir. 2009). While the Court must construe the complaint in the light most favorable to the plaintiff, it need not accept a "legal conclusion couched as factual allegation." Baraka v. McGreevey, 481 F.3d 187, 195 (3d Cir. 2007); Fowler, 578 F.3d at 210-11; see also Iqbal, 556 U.S. at 679 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, will not suffice." Iqbal, 556 U.S. at 678.

Moreover, a complaint that alleges – as the SAC does here – that the defendant violated the CFA must meet the heightened pleading standard established by Federal Rule of Civil

5

Procedure 9(b).  Frederico v. Home Depot, 507 F.3d 188, 200 (3d Cir. 2007); Maniscalco v. Brother Intern. Corp. (USA), 627 F. Supp. 2d 494, 500 (D.N.J. 2009).  Frederico explains that

> a plaintiff alleging fraud must state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the "precise misconduct with which [it is] charged."  To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.

507 F.3d at 200 (internal quotation omitted).  Stated differently, "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue."  See In re Suprema Specialties, Inc. Sec. Litig., 438 F.3d 256, 276 (3d Cir. 2006) (internal quotation and marks omitted).   "[C]onditions of a person's mind," including "knowledge," may be "alleged generally."  Fed. R. Civ. P. 9(b).  But even when "pleading knowledge, the complaint still must contain more than a 'conclusory allegation,' and the pleading must meet the 'less rigid – though still operative – strictures of Rule 8.'"  Gotthelf v. Toyota Motor Sales, U.S.A., Inc., 525 F. App'x 94, 103 n.15 (3d Cir. 2013) (quoting Iqbal, 556 U.S. at 686-87).

      B.      **Plaintiff's CFA Claim**

The Court's previous decision to dismiss the CFA claim focused on two distinct pleading deficiencies.  First, the Court found that the facts pleaded in the FAC failed to plausibly establish the existence of a defect in Plaintiff's non-CAS 7-series vehicle.  (Aug. 29, 2013 Op. at 11.)  Second, the Court found that the FAC pleaded BMW's knowledge and awareness of the alleged defect in a wholly conclusory and insufficient manner.  (See id. at 11.)

The SAC goes to great lengths to rectify the first of these two concerns.  Indeed, Plaintiff

6

now presents scores of new allegations vis a vis the defect, which paint a detailed picture of the inner workings of the transmission in Plaintiff's car and what is allegedly wrong with it – *i.e.*, the "Logic" and "Random Event" defects and how they work together. In this regard, the SAC moves Plaintiff's CFA claim closer to Iqbal's plausibility threshold than did its predecessor.

Whether these new allegations actually describe an actionable defect is, however, a question that need not be answered here, because the SAC does not adequately address the Court's second concern – the failure to plausibly plead BMW's knowledge and awareness of the defect. The fraudulently "unlawful practice" alleged in this case is BMW's "failure to disclose the defects inherent in the [7-series'] electronically controlled transmission system." (See SAC ¶ 157.) Under this theory, New Jersey law requires Plaintiff show BMW "knowingly, with the intent of inducing reliance, conceal[ed], suppress[ed], or omit[ed] a material fact." Gotthelf, 525 F. App'x at 104 (quoting Jersey Cent. Power & Light Co. v. Melcar Util. Co., 59 A.3d 561, 571 (N.J. 2013)).[6] But a close reading of the SAC reveals that Plaintiff's allegations in this regard remain fatally deficient.

Initially, the Court cannot credit the SAC's numerous conclusory allegations regarding BMW's knowledge or awareness of the defects. See Iqbal, 556 U.S. at 678-79. Thus, Paragraphs like 127 and 128, which allege that BMW had "notice" or "knowledge" of the alleged defect because of "consumer complaints" or "demands for repairs," are of little utility to Plaintiff at the motion to dismiss stage because they provide no facts describing those complaints or demands. (See also SAC ¶ 110 ("Upon information and belief, BMW also knew about the Random Event Defect").) The allegations concerning complaints filed with the NHSTA are

---

[6] The Court is aware of the non-binding status of unpublished Third Circuit opinions. See 3d Cir. I.O.P. 5.7 (2010). When, however, the reasoning employed in a non-precedential Third Circuit opinion impresses the trial court as being logical and cogent, the trial court can certainly rely upon that unpublished opinion as persuasive authority.

similarly unhelpful to Plaintiff here, for the simple fact that what consumers told the NHSTA about their non-CAS 7-series sedans tells the Court nothing about what BMW knew about non-CAS vehicles and when it knew it.  (See, e.g., SAC ¶¶ 120, 122.)[7]

After sorting through the SAC, the only thing that can be stated with any amount of certainty is that it alleges that BMW itself received less than ten complaints regarding "failure[s]" in model year 2002 through model year 2008 7-series sedans.  (See Dalton Decl., Ex. E (Office of Defects Investigation Closing Resume).)[8]  These complaints presumably include failures in both CAS and non-CAS equipped vehicles, so they in fact say little about when BMW was apprised of rollaway issues in non-CAS 7-series sedans.  The SAC is otherwise devoid of facts showing "when, before the time of the purchase of [Plaintiff's] vehicle, BMW learned of the defect, how it gained that knowledge, who at the company possessed the knowledge, and when or how the ultimate decision was made not to disclose this supposed knowledge of the defect from customers."  (Aug. 29, 2013 Op. at 11.)   Stated differently, Plaintiff has still not presented sufficient factual allegations to support the plausible inference that BMW "knowingly,

---

[7] Thus, it is unclear what of any use the Court can make out of the statement – repeated throughout the SAC – that thirty-two of the fifty-two "reports alleging vehicle rollaway" concerned non-CAS vehicles.  (See, e.g., SAC ¶ 125.)  The SAC and the documents relied upon therein do not distinguish which, if any, of those thirty-two reports were made to BMW.  What is clear, however, is that the NHSTA's Office of Defects Investigation was aware of all thirty-two of the non-CAS rollaway reports, and yet independently concluded that a "vehicle based safety defect trend was not identified in" them.  (Dalton Decl., Ex. E.)  Plaintiff has failed to adequately explain how BMW could plausibly have knowledge of a defect in non-CAS 7-series sedans when the NHSTA's own defect investigation unit was privy to at least the same amount of information regarding those vehicles as BMW and found nothing wrong.  (See Mov. Br. at 3.)

[8] This document as well as any operative warranty agreement may be properly considered at the motion to dismiss stage, as both are "integral to or explicitly relied upon in the complaint . . . ."  (See Aug. 29, 2013 Op. at 13 n.7 (quoting In re Burlington Coat Factory Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).)

with the intent of inducing reliance," concealed, suppressed, or omitted a material fact – *i.e.*, a defect in the transmission of non-CAS 7-series sedans.  See Jersey Central, 59 A.3d at 571.[9]

Plaintiff effectively admits as much, arguing that "details" regarding who at BMW knew about the "Logic" and "Random Event" defects and "how BMW learned of the defect[s]" "are not needed" here.  (See Opp. Br. at 6.)  Instead, Plaintiff contends that BMW "had knowledge of the defect from the outset" because "the defect [pleaded] in the SAC is an engineering decision by BMW . . . ."  (See id.)  This argument is advanced without legal support.  Moreover, it is a circular argument that could be used to impute knowledge for purposes of the CFA to any manufacturer who designs and markets a product that is later alleged to be defective – "I (consumer) believe this item to be defective; you (manufacturer) designed the item and sold it; ergo, you knew it was defective, and thus you defrauded me when you elected not to tell me about the defect."   The Court is unaware of any New Jersey case that stands for this novel proposition, and concludes that it is highly unlikely the New Jersey Supreme Court would accept such an argument.  It may be, as Plaintiff argues, that because BMW designed Plaintiff's vehicle BMW "cannot disclaim knowledge of [its intentional design] choices."  (Opp. Br. at 7.)  But it does not follow that BMW cannot disclaim knowledge of a defect when faced with a consumer fraud lawsuit.  Plaintiff cannot equate design choices with fraudulent conduct simply by saying so and without pleading facts supporting a plausible inference of knowledge on BMW's part.  If

---

[9] It is certainly true that BMW had knowledge of the complaints filed with the NHTSA when BMW began working with the Administration in 2011 to investigate rollaways in allegedly defective CAS-equipped 7-series sedans.  This knowledge, however, is of no moment for CFA purposes, since it post-dates Plaintiff's purchase of her vehicle by more than two years.  See Alban v. BMW of North America, LLC, No. 09-5398 (DRD), 2010 WL 3636253 (D.N.J. Sept. 8, 2010) ("Plaintiff's Complaint does not include any other information as to when, before the time he purchased his vehicle, BMW" learned or gained knowledge of the alleged defect); Gotthelf, 525 F. App'x at 104 (discounting, for purposes of CFA claim, complaints filed with the NHTSA that were provided to Toyota after the expiration of plaintiff's warranty period).

Rule 8(a), Iqbal, and Twombly are to have any force whatsoever, a complaint cannot state a CFA claim that requires the plaintiff plead knowledge by merely alleging that the defendant designed a defective product.

In sum, the CFA claim contained in the SAC is not materially different than the one pleaded in the FAC – namely, it is an attempt to piggyback a consumer fraud lawsuit onto Defendant's voluntary recall of certain potentially defective CAS-equipped 7-series sedans. The problem is that the car at issue in this case does not have a CAS system. This Court provided Plaintiff with leave to file an SAC with the express goal of plausibly stating that something was wrong with non-CAS 7-series vehicles, and that BMW knew about the problem and hid it from its customers. It is readily apparent the SAC has failed as to the latter of those two tasks. It follows that Plaintiff cannot state a claim for consumer fraud under New Jersey law, and the CFA cause of action will be dismissed with prejudice.

### C. Plaintiff's Warranty Claims[10]

The "general rule" is that "an express warranty does not cover repairs made after the applicable time has elapsed" and as such "latent defects discovered after the term of the warranty are not actionable." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 616 (3d Cir. 1995); Canal Elec. Co. v. Westinghouse Elec. Co., 973 F.2d 988, 993 (1st Cir. 1992) ("case law almost uniformly holds that time-limited warranties do not protect buyers against hidden defects"). The Court's previous Opinion dismissed the warranty-based claims for the simple reason that the FAC did not plead that the alleged defect had manifested itself within the terms of BMW's four year/50,000 mile warranty. (See Aug. 29, 2013 Op. at 13.) The Court, relying in

---

[10] Because New Jersey law allows sellers to modify the implied warranty of merchantability, N.J. Stat. Ann. §§ 12A:2-314 & -316, the Court's analysis applies with equal force to the MMWA and implied warranty claims, and neither party argues otherwise.

large part on Judge Debevoise's decision in <u>Alban</u>, 2010 WL 3636253, and the Second Circuit's decision in <u>Abraham v. Volkswagen of America Inc.</u>, 795 F.2d 238, 250 (2d Cir. 1986), rejected Plaintiff's argument that the time and mileage limitations to BMW's express warranty were unconscionable because BMW knew about the defective transmission at the time Plaintiff's 7-series was sold. (<u>See</u> Aug. 19, 2013 Op. at 13-14.)

The SAC still does not allege that Plaintiff discovered and reported the alleged defect to BMW within the terms of the warranty. Instead, Plaintiff advances two legal arguments. The first is grounded in the text of the warranty provision itself. In essence, Plaintiff contends that since the warranty is written in the "passive" voice, both the vehicle's owner and BMW can "discover[]" a defect for warranty purposes. (<u>See</u> Opp. Br. at 10.) Under Plaintiff's reading of the warranty, because BMW "knew" about the defect and did nothing about it during the warranty period, BMW breached the warranty. (<u>See</u> <u>id.</u>) Plaintiff's argument, however, misconstrues the plain meaning of the warranty language. The language Plaintiff relies on, that "the vehicle must be brought, upon discovery of a defect in material or workmanship," qualifies the preceding clause, "To obtain service under this warranty . . . ." The word "discovery" is therefore directed at the individual who would seek to "obtain service" during the warranty period – the car's owner, not BMW itself.[11] Plaintiff does not present and the Court is unaware of any authority to support the proposition that a seller has the obligation to both provide

---

[11] The Court also rejects Plaintiff's argument that the operative warranty period "did not begin to run until BMW refused to perform under the warranty." (Opp. Br. at 17.) This argument does violence to the clear language of the warranty provision itself, which provides that the "warranty begins on the date of first retail sale, or the date the vehicle is first placed in service . . . , whichever is earlier." (Dalton Decl., Ex. H, at 30.) The Court agrees with Defendant that Plaintiff's "perpetual-warranty" argument is novel and unsupported (<u>see</u> Reply Br. at 13-14), and would give buyers the benefit of a bargain far different from the one struck – namely, the right to obtain service on a problem discovered during the express warranty period.

11

warranty service when necessary and also discover for the buyer the problem prompting such service.

Plaintiff also argues that BMW's time and mileage warranty limitations are unconscionable because BMW knew of the transmission defect in non-CAS 7-series vehicles and "failed to disclose [it] to consumers like [Plaintiff] . . . ." (Opp. Br. at 11.) The Court has previously rejected this identical argument (see Aug. 29, 2013 Op. at 13-14), and sees no reason to re-visit it here.[12] The Court will, however, address Plaintiff's argument that the cases relied upon in the Court's previous opinion – namely, Alban, Abraham, and Duquesne – are distinguishable because those cases involved "wear and tear" defects and this case involves a design defect. (See Opp. Br. at 13.) This argument is unpersuasive because it ignores the language of the rule that actuated those earlier decisions – "breach of warranty actions premised on defects that did not arise until after the warranty expire[s]" are prohibited period, regardless of a plaintiff's assertion that the defendant "knew that his vehicle was defective before the time-limit took effect." See, e.g., Alban, 2010 WL 3636253, at *7 (citing Duquesne, 66 F.3d at 616). The operative rule thus focuses on when an alleged defect manifests, not the type of defect at issue, and the Court sees no reason why a design defect that manifests itself outside the time and mileage period should be treated differently than a "wear and tear" defect that comes to light at a similarly late date.

---

[12] Plaintiff contends that the SAC "set[s] forth additional facts establishing that the enforcement of any time period limitation of the warranty . . . is unconscionable." (See id.) In support of this argument, Plaintiff cites to Paragraph 174, which alleges that BMW, with "knowledge and notice of the defect" acted to deny Plaintiff "the benefit of" its warranty, which renders "the enforcement of any limitations on [BMW's] obligations" under the warranty unconscionable. (See SAC ¶ 174.) This allegation, however, is the prototypical "legal conclusion couched as a factual allegation" that the Court need not accept. Iqbal, 556 U.S. at 678. A single conclusory pleading, by itself, cannot plausibly plead unconscionable commercial practices by BMW.

Indeed, Plaintiff's argument also ignores the cases in this District that have relied on Alban and Abraham to dismiss breach of warranty claims that allege design defects. See, e.g., Dewey v. Volkswagen AG, 558 F. Supp. 2d 505, 510 (D.N.J. 2008) (rejecting warranty claims based on "design defects in the Class Vehicles' pollen filter gasket areas and sunroof drains"); Moulton v. LG Elects. USA, Inc., No. 11-4073 (JLL), 2012 WL 5555496, at *1, *3 (Nov. 14, 2012) (denying reconsideration of Order dismissing breach of warranty claim based on defectively designed televisions).[13] In the absence of authority distinguishing between wear and tear and design defects, the Court is unwilling to depart from the general and well established rule that a breach of warranty claim cannot be based on a defect that first manifests itself after the time or use limitations imposed on the express warranty have expired. See Duquesne, 66 F.3d at 616. To the extent Plaintiff's warranty claims rely on the distinction between different types of alleged defects, the Court finds that, in this case at least, it is one without a difference.

Even if the Court felt compelled to depart from Alban and Duquense – because of the nature of the defect alleged or otherwise – Plaintiff's argument is contingent on the assumption that the SAC plausibly pleads BMW's knowledge of a defective transmission in non-CAS 7-series sedans. (Opp. Br. at 11 ("A manufacturer can't know of a defect in its product and shield itself from liability through a warranty.").)[14] But as has already been discussed in relation to

---

[13] Plaintiff's argument also runs counter to the express language of the warranty itself, which states that the warranty applies to defects in "material or workmanship . . . ." (Dalton Decl., Ex. H, at 30.) Insofar as it is relevant, the Court is unsure why "material and workmanship" defects would not cover alleged defects in design of the 7-series' component parts, such as the transmission.

[14] The Court is aware that Skeen v. BMW of North America, LLC, No. 13-cv-1531 (WHW), 2014 WL 283628 (D.N.J. Jan. 24, 2014), expressly rejects Alban and finds that the plaintiffs in that case "adequately allege[] substantive unconscionability by claiming that Defendants knew [an automotive part] would fail and manipulated . . . warranty terms to avoid paying for it." Id. at *14. This Court concludes that the reasoning utilized in Alban is a more cogent application of Duquense, binding Third Circuit authority. Even if the Court were inclined to follow Skeen it

13

Plaintiff's CFA claim, nothing in the SAC plausibly indicates BMW's awareness of any defect in Plaintiff's non-CAS vehicle or action by BMW taken to conceal such a defect.  Hampered by this pleading deficiency, Plaintiff's proposed rule – that BMW's undisclosed "knowledge about the defect . . . renders the time limitation on the warranty unenforceable" – is of no help to her here.  (See Opp. Br. at 11.)

In short, the SAC does not assert that the defect in Plaintiff's 7-series manifested itself within four years or 50,000 miles of the vehicle's first retail sale, and does not plausibly allege that BMW's warranty limitations are unconscionable.  Plaintiff's MMWA and implied warranty claims will be dismissed with prejudice.

### III. Conclusion

For the foregoing reasons, the Court will grant the motion to dismiss filed by Defendant BMW of North America, LLC.  [Docket Entry 45.]  The Second Amended Complaint will be dismissed with prejudice.  An appropriate Order will be filed herewith.

          s/ Stanley R. Chesler
          STANLEY R. CHESLER
          United States District Judge

Dated:  February 20, 2014

---

would not benefit Plaintiff here, because the SAC in this case does not plausibly demonstrate BMW "knew" Plaintiff's non-CAS transmission "would fail and manipulated" warranty terms "to avoid paying for" its repair.  See Skeen, 2014 WL 283628, at *14.